# IN THECHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| FOR SENIOR HELP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-00126 |
| | ) | |
| WESTCHESTER FIRE | ) | JURY DEMAND |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

_____

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

_____

Comes the Plaintiff, For Senior Help, LLC, by and through counsel, and hereby submits the following Response to Plaintiff's Motion for Summary Judgment and Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment.

## I. INTRODUCTION

The Defendant, Westchester Fire Insurance Company ("Westchester"), sold an insurance policy (the "Policy") to Medex Patient Transport, LLC ("Medex"), a company that franchised non-emergent medical transportation companies. The Policy contained a "Franchisor's Endorsement" that insured Medex against claims for certain types of breaches of contract. Medex subsequently breached two separate contracts with Plaintiff For Senior Help, LLC ("FSH"). As Westchester concedes, both of these breaches fall

1

within the insuring language of the Franchisor's Endorsement. However, Westchester, who happily collected premiums from Medex for this coverage, has taken advantage of the fact that Medex also perpetrated fraud on FSH, primarily prior to the existence of either contract, to deny coverage for these breaches based on a fraud exclusion in the Policy.

Westchester's argument fails for a number of reasons. First, Westchester argues that liability for all of FSH's claims was based on fraudulent conduct. This assertion is both legally flawed – as there is no such claim as "fraudulent breach of contract" - and factually flawed as well – because the arbitrator made no such finding. The arbitrator, in fact, found as a matter of law that the conduct forming the basis for the fraud award was different from the conduct underlying the award for breach of contract. Further, under the concurrent cause doctrine, so long as covered conduct was a substantial part of the cause of the contract damages, the contract claim is covered.

## II. FACTS

1.     Medex offered franchises for the operation of a business that provides nonemergency transportation services and related patient-care services.

2.     On or about February 27, 2015, Jones and FSH entered into a Franchise Agreement (the "Franchise Agreement") with Medex. FSH paid Medex a total franchise fee of $78,363.15. (See Doc. 1-5, ¶ 11).

3.     FSH also took an assignment of an Area Developer Agreement (the "ADA"), under which it obtained the right to operate a Medex area developer business that could solicit, qualify, train and assist Medex franchisees within an exclusive territory (the "Area

2

Developer Agreement"). FSH was to be paid a percentage of royalties paid by franchisees within the area covered by the agreement. (See Doc. 1-4). FSH purchased the rights to the Area Developer Agreement for $70,000. (See Doc. 1-5, ¶ 11).

4.     Section 14 of the Franchise Agreement sets forth the operations assistance Medex was obligated to provide to FSH. Specifically, Section 14.3 states:

> In exchange for the Operations Fee, Franchisor shall operate a centralized service center to provide the following services to Franchisee: (i) call center, (ii) centralized dispatch, (iii) route management, (iv) certain office functions, (v) reporting invoices to Franchisee, and (vi) route efficiency planning and the mapping of trouble spots. Franchisor shall reasonably determine the extent of these services. Franchisor has sole discretion to determine the manner in which it provides these services. Franchisor shall use commercially reasonable efforts to provide these services to Franchisee in the same first-class and high-quality [manner] as performed for patient Transport Businesses operated by Franchisor or its Affiliates.

(the "Operations Services")(See Doc. 1-3,¶ 14.3).

5.     In May 2016, Medex terminated both the Franchise Agreement and the ADA. The purported reason for the termination of both agreements was FSH's purported breach of the Franchise Agreement. (See Exhibit 1).

6.     In March 2017, FSH commenced an arbitration with Medex by filing an arbitration demand with the American Arbitration Association. (See Exhibit 2).

7.     In the arbitration demand, FSH asserted a number of claims against Medex. FSH claimed, for example, that prior to the execution of the Franchise Agreement, Medex had misrepresented the nature and quality of the Operations Services. This assertion formed the basis of claims for fraud in the inducement and intentional misrepresentation.

3

(See Exhibit 2, ¶¶ 99-123).[1] The pre-contract misrepresentations also formed the basis of a consumer protection claim. (See Id., ¶¶ 139-145).

8.     Most importantly for purposes of the instant motions, Medex also brought claims against Medex for breach of the Franchise Agreement and the ADA. (See Id., ¶¶ 124-138).

9.     FSH's specific allegation breach of the Franchise Agreement was that:

[Medex] materially and substantially breached the Franchise Agreement by: (1) failing to provide the Operations Services as detailed herein; and (2) failing to act in a reasonable sufficient, and timely manner to respond to FSH's near-countless communications about the problems and errors in [Medex's] Operations Services.

(See Id., ¶ 131).

10.     FSH alleged that:

Medex failed to provide the Operations Services in anything remotely close to the first-class and high quality manner required by the Franchise Agreement. Medex's failures generally fell into the following categories: (a) call center failures; (b) centralized dispatch, route management, and route efficiency failures; (c) office function failures; and (d) invoice reporting failures.

(See Id., ¶ 40).

11.     FSH's specific complaints included: (a) customers experienced long wait times; (b) Medex made numerous errors in assigning drivers and scheduling trips; (c) Medex failed to properly enter data into the software system used by the franchisees; and (d) failed to provide accurate invoicing. (See Id., ¶¶ 38-71). FSH did not allege that Medex did any of these things intentionally or fraudulently. (See Id.).

12.     FSH also alleged that Medex terminated the ADA without cause. (See Id.

---

[1] In the Arbitration Demand, FSH referred to Medex by its trade name, "Caliber."

¶¶ 136-138).

13.    After a week-long arbitration, the arbitrator issued an award on January 8, 2018.  (See Doc. 1-5).

14.    Prior to the award, FSH voluntarily dismissed its claim for fraud in the inducement.  The arbitrator found for FSH on all of the remaining claims.  (See Id.).

15.    In the award, the Arbitrator focused on the fraud claim. Regarding the claim for breach of the Franchise Agreement, the arbitrator found that Medex failed to provide the Operations Services in a "firs-class" and "high-quality" manner as required by the Franchise Agreement.   Specifically, the arbitrator found that: (a) FSH's customers experienced call hold times that were higher than the industry standard; (b) the software being utilized by Medex was deficient;  (c) Medex did not provide sufficient call center support, such as scheduling and invoicing support, that it was obligated to provide by the Franchise Agreement; (d) "the Call Center was not 24/7 and an after hour answering service was not able to and did not provide the promised operations support;" and (e) Medex failed to make appointments, keep appointments, or provide equipment.  (See Id., ¶¶ 22, 25, and 28).

16.    The arbitrator consistently referred to Medex's breach of the Franchise Agreement as a "failure" to provide the services at the level required by the Franchise Agreement, and consistently described these failures as "deficiencies".  (See Id., ¶¶ 19, 21, 25, 28-29, 30, 31).

17.    The arbitrator did not find that Medex fraudulently or intentionally breached the Franchise Agreement.  (See Id.).

5

18.     The arbitrator found that Medex terminated the ADA without cause.  (See Id., ¶ 13).  The arbitrator did not find that this termination was fraudulent.  (See Id.).

19.     The arbitrator made the following awards:

a.      Against Medex for breach of contract:

Breach of Franchise Agreement          $120,461.00

Breach of ADA                          $452,065.00

Total for breach of contract:  $572,526.00

b.      Against Medex Patient Transport Services, LLC, Kyle Calvert, and Klein Calvert, jointly and severally, for fraud in the amount of $613,702.00;

c.      Against Medex Patient Transport Services, LLC, Kyle Calvert, and Klein Calvert, jointly and severally, for misrepresentation by concealment for $613,702.00;

d.      Against Medex Patient Transport Services, LLC, Kyle Calvert, and Klein Calvert, jointly and severally, for violation of the Tennessee Consumer Protection Act for $613,702.00;

e.      Against Medex Patient Transport Services, LLC, Kyle Calvert, and Klein Calvert, jointly and severally, for attorneys fees and expenses in the amount of $244,717.00;

f.      Against Medex Patient Transport Services, LLC, Kyle Calvert, and Klein Calvert, jointly and severally, for arbitration fees and costs in the amount of $34,200.01.

(See Doc. 1-5, ¶ 48).

20.     The arbitrator also found that "[t]he awards for violation of the Tennessee Consumer Protection Act and for fraud and misrepresentation represent damages for the same conduct, and thus the awards are not cumulative."  (See Id., ¶ 47).

21.     After the arbitrator issued the award, FSH moved for confirmation of the award and entry of final judgment in Davidson County Chancery Court.  The Chancery

6

Court affirmed the arbitrator's award and entered final judgment on February 26, 2018. The Chancery Court also stated in the judgment that:

> The damages for fraud, misrepresentation by concealment, and violation of the Tennessee Consumer Protection Act set forth in subparagraphs b, c, and d are for the same conduct and are not cumulative.

(See Exhibit 3).

## III. ARGUMENT

If the arbitrator that issued the award in this case knew that he needed to spell out in the award that the contract breaches by Medex were not fraudulent, then he would have done so. But there was no reason for the arbitrator to believe this was necessary, because fraud is not an element of breach of contract. Once a contract is established, the issues are whether it was breached and whether there were damages as a result. The arbitrator found that Medex failed to provide the Operations Services in a "first-class" and "high-quality" manner, and that the ADA was terminated without cause, and that is where the inquiry ended regarding the breach claims.

It is not surprising, therefore, that the only *mens rea* findings by the arbitrator in his award are intentional misrepresentations by Medex. These findings were required to address fraud claims. Westchester, however, has seized on these findings to argue that the arbitrator found that *all* of the conduct causing harm to FSH was fraudulent, and therefore that the fraud exclusion removes coverage.

Westchester is incorrect. The fraud and contract claims were completely separate

7

and divisible. The breach – by failure to provide the Operations Services – was not the fraud. The fraud was misrepresenting the quality of the Operations Services as they existed *prior to execution of the Franchise Agreement*. The arbitrator simply did not find that the breaches of contract involved fraud – and FSH never made any such claim.

Westchester's argument regarding the application of the exclusion for refund claims also fails. Although FSH's damages for breach of the Franchise Agreement were contractually limited to the amount of the franchise fee and royalties paid to Medex, the claim was not based upon or arise from a claim for a refund.

## A. Rules of Interpreting Insurance Policies

Under Tennessee law, "[t]he question of the extent of insurance coverage is a question of law involving the interpretation of contractual language." *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012). "Insurance contracts are 'subject to the same rules of construction as contracts generally,' and in the absence of fraud or mistake, the contractual terms 'should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.' " *Id.* (quoting *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386–87 (Tenn. 2009)). Tennessee courts also consider the policy as a whole and construe its terms "in a reasonable and logical manner." *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 148 (Tenn. Ct. App. 2001).

When coverage questions arise, the courts should consider the components of an insurance policy in the following order: (1) the declarations, (2) the insuring agreements and definitions, (3) the exclusions, (4) the conditions, and (5) the endorsements. *Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 20 (Tenn. Ct. App. 2002). As discussed below, in the instant case, the insuring agreement, as modified by an endorsement, clearly provide coverage for the awards for breach of the Franchise Agreement and the ADA. Westchester appears to concede this, but argues that exclusions remove coverage for both awards. For the reasons discussed below, FSH disagrees.

**B.    The Insuring Language of the Policy Provides Coverage for Breach of the ADA and the Franchise Agreement**

Westchester has quoted extensively from the Policy. The overwhelming majority of the Policy provisions repeated verbatim by Westchester have no application to this case. What this case boils down to is the interpretation and application of just a few provisions of the Policy. First, the following insuring provisions found in the Franchisor's Endorsement added certain acts to the definition of "wrongful act," thereby providing coverage for such acts:

> 4.    **the failure to comply with** any federal or state law or regulation, or **the terms of the Franchise Contract, affecting the renewal or termination of the relationship of the parties to a Franchise Contract**;

> 5.    The **failure of the franchisor to provide services**, training, advertising, or other support to the franchisees is required under the terms of a Franchise Contract or disclose to franchisees in an offering circular or other distributed disclosure document

(See Doc. 1-1, p. 19)(emphasis added).

9

As Westchester appears to concede, "Franchise Contract" under the policy includes both the Franchise Agreement and the ADA.[2]  Thus, paragraph 4 of the Franchisors Endorsement obligates Westchester to provide coverage for the termination of either the Franchise Agreement or the ADA in violation of the terms of those agreements.  Further, paragraph 5 obligates Westchester to provide coverage for a breach of the Franchise Agreement by the failure to provide services.  These are the *exact* contract claims by FSH in the Arbitration demand, and the breach of contract awards were specifically for: (1) termination of the ADA and the Franchise Agreement in violation of the terms of those contracts; and (2) breach of the Franchise Agreement by failure to provide the Operations Services in a "first-class" and "high quality" manner, as required by the contract.

The question, therefore, is whether a policy exclusion applies.  Although Westchester relies on a number of policy exclusions, the only two exclusions that are worthy of argument are the fraud exclusion and the exclusion in the Franchisor's Endorsement for claims "alleging, based upon, arising out of or attributable to the recovery by franchisee of actual sums paid to the Insured by franchisee which constitute any initial fees, service fees, royalties  . . ."  Neither of these exclusions apply, as explained below.

_____

[2] A "Franchise Contract" is defined by the Franchisors Endorsement as "any franchise agreement, area agreement or development agreement" (See Doc. 1-1, p. 19).

10

**C.     The Fraud Exclusion does not Apply**

> **1.     The Arbitration Award Included Awards for the Exact Same Claims that Triggered Coverage Under the Policy**

By providing a defense to Medex in the FSH litigation, Westchester acknowledged that the Complaint/Arbitration Demand contained claims that triggered coverage under the Policy. Although it often occurs that a duty to defend arises where there is no subsequent duty to indemnify, this usually happens "when trial on the merits of the underlying claim proves the facts to be otherwise than as alleged, and judgment is entered on a ground dissimilar to the one contained in the complaint." *St. Paul Fire & Marine Ins. Co. v. Torpoco*, 879 S.W.2d 831, 835 (Tenn. 1994).

This is not the situation in the instant case. FSH alleged in the underlying case that Medex breached the Franchise Agreement by failing to provide Operations Services and breached both the Franchise Agreement and the ADA by terminating both agreements in violation of contractual provisions. Neither of these claims contained fraud as an element, and there was no allegation that the contract breaches were "fraudulent." The arbitration resulted in judgments on the exact contract claims that were alleged in the Arbitration Demand.

Westchester apparently fails to understand that a party may be guilty of fraud and may also breach a contract, independent of the fraud. While it is true that Medex engaged in fraudulent and dishonest conduct, FSH's judgments for breach of the Franchise Agreement and the Area Developer Agreement (ADA) were wholly separate legal claims based on completely different facts. The overwhelming majority of the fraud occurred

11

prior to executing the Franchise Agreement, and there were no allegations whatsoever of fraud regarding the ADA.

Westchester posits that "[t]he liability for all claims alleged against Medex were attributable to fraudulent conduct." (See Westchester's memorandum, p. 14). Westchester's argument is therefore apparently that the arbitrator found that Medex "fraudulently breached" the Arbitration Agreement and the ADA. This is a nonsensical argument. There is, of course, no such legal claim as a "fraudulent breach of contract." There would have been no reason whatsoever for the arbitrator to even consider whether Medex acted fraudulently in breaching the contracts, because fraud is not an element of any claim for breach of contract. Westchester's argument that the arbitrator ruled that Medex committed fraudulent acts by breaching the contracts is thus a legal absurdity.

Westchester's argument is also unsupported by the record. Although the arbitrator repeatedly discusses fraudulent misrepresentations, it is always in the context of the fraud claims. The arbitrator did not state anywhere in the award that any of the conduct that constituted breach – the failure to provide the Operations Services in a "first-class" manner – was fraudulent. Medex's representations about the services was, but again, these are two separate things. Further, although the arbitrator made no specific *mens rea* findings regarding the conduct that caused the breaches, the arbitrator consistently and repeatedly referred to this conduct as "failures" and "deficiencies." This is not the language of fraud.

## 2. Westchester does not Explain how the ADA was "Fraudulently Breached"

Even if there were such a claim as "fraudulent breach of contract," Westchester has offered no explanation as to how the ADA was supposedly breached by fraud. The allegations of fraud and the arbitrator's finding of fraudulent conduct consisted entirely of misrepresentations regarding the quality and nature of the Operations Services. Yet the Operations Services had nothing whatsoever to do with the ADA. The ADA was an agreement under which FSH would manage existing and pursue new franchisees in a certain area and Medex would pay FSH a percentages of the royalties generated by franchisees within the area. Medex terminated the ADA because it believed that FSH had breached the Franchise Agreement. In order to find that ADA was wrongfully terminated, the arbitrator was not required to make any finding of fraud. He made no such finding, and there was never any claim that fraud was involved in the ADA's termination.[3] Therefore, regardless of the Court's ruling regarding the award for breach of the Franchise Agreement, the Court should rule that the award for breach of the ADA was covered under the policy.

---

[3] It is difficult to conceive of how (or why) the arbitrator could have ruled that termination of the ADA was fraudulent. It is notable, however, that arbitrator did not find that Medex *did not believe* that FSH had breached the Franchise Agreement before using that as a reason for terminating the ADA. In fact, the arbitrator did not find that FSH had not breached the Franchise Agreement – he found that Medex committed the first material breach, thereby rendering moot any subsequent breach by FSH.

13

### 3. The Arbitrator Found, as a Matter of Law, that the Conduct Supporting the Fraud Claims was Different than the Conduct Supporting the Contract Claims

The essential question regarding coverage for the breach of the Franchise Agreement by failing to provide the Operations Services in a "first-class" and "high-quality" manner is whether the failure to provide those services was fraudulent. This is where Westchester completely misses the point. There was never any claim by FSH, much less any finding by the arbitrator, that the failure to provide the Operations Services itself constituted fraud. The overwhelming majority of the fraudulent misrepresentations occurred *before a contract existed*. FSH's fraud claim, in fact, consisted entirely of allegations of pre-contract misrepresentations. While the breach was the failure to provide the Operations Services in a "first-class" manner, the fraud consisted of *misrepresenting the quality of the Operations Services*. These are two completely different things that existed independent of each other. The breach by failure to provide the Operations Services would have been a breach, and would have resulted in the same damages, whether or not Medex misrepresented the nature and quality of the services prior to or even after the execution of the Franchise Agreement. The application of simple "but for" causation rules unambiguously results in a finding of coverage. The breach was established by covered conduct. *Lying* about the breach – and thus causing wholly different damages – is not covered.

Significantly, the arbitrator and trial court found, as a matter of law, that the fraud and TCPA claims were based on different conduct than the conduct establishing the breach claims. Under the doctrine of election of remedies, a party cannot recover twice for the

14

same conduct. *See, e.g. Allied Sound, Inc. v. Neely*, 909 S.W.2d 815, 822 (Tenn. Ct. App. 1995)("the purpose of [the election of remedies] doctrine is to prevent double redress for a single wrong"). Applying this doctrine, the arbitrator and the trial court found that "[t]he awards for violation of the Tennessee Consumer Protection Act and for fraud and misrepresentation represent damages for the *same conduct*, and thus the awards are not cumulative." (See Doc 1-5, ¶ 48)(emphasis added).

The awards for breach of the Franchise Agreement and the ADA were cumulative, however. Accordingly, as a matter of law, they could not have resulted from the same conduct that formed the basis for the fraud and TCPA claims.

### 4. The Concurrent Cause Doctrine Mandates Coverage Even if Fraud was Involved in the Breaches of Contract

As stated above, the application of "but-for" causation results in a finding of coverage, since misrepresenting the quality of the Operations Services does not constitute breach – the failure to provide "high quality" services does. But the Tennessee Supreme Court has ruled that application of "but-for" causation is too stringent for the insured. *See Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991). In *Watts*, the Tennessee Supreme Court adopted the concurrent cause doctrine, under which "an insurer should not be excused from its obligation [of coverage] . . . unless it has been determined that the loss being complained of did not result in substantial part from a risk for which it provided coverage and collected a premium." *Id*. at 888.[4] As the Tennessee Court of Appeals has

---

[4] *Watts* involved a homeowner's policy. The concurrent cause doctrine has been applied to commercial policies as well. *See, e.g. Planet Rock, Inc. v. Regis Ins. Co., 6 S.W.3d 484, 493 (Tenn. Ct. App. 1999).*

15

stated: "That multiple causes may have effectuated the loss does not negate any single cause; that multiple acts concurred in the infliction of injury does not nullify any single contributory act." *Planet Rock, Inc. v. Regis Ins. Co.*, 6 S.W.3d 484, 493 (Tenn. Ct. App. 1999).

The question, therefore, is whether covered (i.e. non-fraudulent) conduct was a substantial part of the cause of the breach of contract. The arbitrator and the trial court have already answered this question by ruling that the contract damages were cumulative to the fraud and TCPA damages – because they were not based on the same conduct. Again, the termination of the ADA and the failure to provide the Operations Services in a "first-class" and "high-quality" manner were not fraudulent – the fraud occurred when Medex (mostly before a contract existed) lied about the services being "first class" and "high quality." There was never any claim, any evidence, or any ruling that the failure to, for example, maintain call hold times at or above industry standards, was fraudulent. Rather, it was a "failure" and a "deficiency." That failure and deficiency, and others, were not only a substantial part of the cause of the breaches, they were the *sole* cause.

### 5. Paragraph 12 of the Award does not Support Westchester's Argument

Westchester places great emphasis on paragraph 12 of the award, which states:

Respondents breached and wrongfully repudiated and terminated the Agreement and ADA and defrauded Claimant by intentional and knowing conduct causing damages to Claimant.

16

(See Doc. 1-5, ¶ 12).

Contrary to Westchester's assertion, this paragraph actually supports FSH's argument, as it clearly separates the breaches from the fraud. The paragraph clearly states that Medex did two separate things: (1) breached and wrongfully repudiated and terminated the contracts; and (2) defrauded claimant by intentional and knowing conduct. These two things, which existed independently, caused damage to FSH.

**D.      The Claim for Breach of the Franchise Agreement did not Arise from a Request for a Refund**

Westchester also relies on the exclusion for claims:

> alleging, based upon, arising out of or attributable to the recovery by franchisee of actual sums paid to the Insured by franchisee which constitute any initial fees, service fees, royalties, lease payments, or payments for goods and services.

The basis for Westchester's reliance on this exclusion is that the award for breach of the Franchise Agreement was limited to a refund of the franchise fee and royalties. This limitation was applied pursuant to the following provision of the Franchise Agreement:

> Franchisee waives and disclaims any right to consequential damages in any action or claim against Franchisor concerning this Agreement or any related agreement. In any claim or action brought by Franchisee against Franchisor concerning this Agreement, Franchisee's contract damages shall not exceed and shall be limited to refund of Franchisee's Franchise Fee and Royalty Fees.

(See Doc. 1-3, ¶ 23.5). An analysis of the claim for breach of the Franchise Agreement and the exclusion, however, reveals that the exclusion does not apply.

17

First, "[i]t is well settled that exceptions, exclusions and limitations in insurance policies must be construed against the insurance company and in favor of the insured." *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991).

Second, the claim for breach of the Franchise Agreement simply does not fall within the express parameters of the exclusion. The claim: (a) did not *allege* that FSH was entitled to a refund; (b) was not *based upon* a refund; (c) did not *arise out of* a claim for a refund; (d) was not *attributable to* a refund or a claim for a refund.

Significantly, a refund of the franchise fee and royalties would not have been included in the measure of damages for breach of the Franchise Agreement for failure to provide Operations Services in a "first-class" and "high-quality" manner. *See, e.g. Hennessee v. Wood Group Enterprises, Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991)(contract damages are benefit of the bargain). FSH could have recovered a refund had it proceeded forward with and won its claim for rescission, but FSH voluntarily dismissed that claim.

It is also significant that if FSH had established benefit of the bargain damages that were *less* than the amount of the franchise fee, FSH would have only recovered its actual damages, and even Westchester would have to concede that the exclusion does not apply. Westchester can only attempt the argument that the exclusion does apply because FSH established benefit of the bargain damages in excess of the franchise fee and royalties, thereby triggering the damages-limitation provision.

18

The damages-limiting provision of the Franchise Agreement is just that – it simply puts a cap on the amount of money that a franchisee can recover for a breach. It does not convert a breach claim into a claim for a refund.

**E.     The Breaches of Contract Occurred During the Policy Period**

Westchester argues that "all of the conduct of Medex during the negotiations leading up to the execution of the Agreement and the ADA in February 2015 cannot serve as the basis for indemnification under the Policy, because those wrongful acts occurred prior to the Policy's retroactive date."  (Westchester's Memorandum, p. 15).  This argument is yet another reflection of Westchester's failure to understand the claims or the award.

FSH does not claim, and the arbitrator did not find, that any pre-contract conduct constituted a breach.  Any such claim would be nonsensical, as one obviously cannot breach a contract that does not yet exist.  Again, the pre-contract conduct constituted the fraud claim and award.  The breach claims all arose after execution of the contract.

**F.     The Other Exclusions Relied on by Westchester do not Apply**

Westchester, without any argument, merely asserts that the following exclusions also apply to deny coverage:

> Alleging, based upon, arising out of or attributable to any assurance, promise, warrant or guarantee of potential sales, earnings, profitability or economic value; and

> Alleging, based upon, arising out of or attributable to . . . unfair business practices . . .

Neither of these exclusions have any application to this case. None of FSH's claims were based upon a promise of potential sales or earnings. And although FSH was awarded damages for violation of the Tennessee Consumer Protection Act, FSH recognizes that the TCPA ward is not covered and has not claimed to the contrary.

## IV. CONCLUSION

For the reasons stated herein, FSH respectfully requests the Court to deny Defendant's Motion for Summary Judgment and to enter judgment in favor of Plaintiff on Count One of its Complaint.

Respectfully submitted,


/s/ Greg Oakley
Gregory H. Oakley, BPR #16237
OAKLEY LAW PLLC
104 Woodmont Boulevard, Suite 201
Nashville, Tennessee 37205
(615) 209-9814
goakley@oakley-law.com

Counsel for Defendants


## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2019 a true and correct copy of the foregoing was served via the Court's electronic filing system to the following:

   Lynsie Gaddis Rust, Esq.
   100 Mallard Creek Road, Suite 250
   Louisville, Kentucky 40207
   lynsie.rust@wilsonelser.com




/s/ Greg Oakley
Gregory H. Oakley