**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **FOR SENIOR HELP, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00126** |
| | ) | **Judge Aleta A. Trauger** |
| **WESTCHESTER FIRE INSURANCE COMPANY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court are: (1) the Motion for Authority of Bankruptcy Trustee to Intervene (Doc. No. 39), filed by John C. McLemore, Trustee, as the proposed intervening party; (2) defendant Westchester Fire Insurance Company's Motion for Partial Summary Judgment (Doc. No. 54); and (3) plaintiff For Senior Help, LLC's Motion for Partial Summary Judgment on its Claim for Bad Faith Failure to Settle (Doc. No. 55). For the reasons set forth herein, the plaintiff's motion will be denied; the defendant's motion will be granted in part and denied in part; and the Motion to Intervene will be granted.

## I.      FACTS AND PROCEDURAL BACKGROUND[1]

### A.      Events Leading to the Underlying Arbitration

This case, reduced to its essence, is a dispute about insurance coverage, but it has a complicated procedural history. In February 2015, plaintiff For Senior Help, LLC ("FSH") entered

---

[1] The facts and events related herein are undisputed unless otherwise noted.

into a franchise agreement with non-party Medex Patient Transport, LLC ("Medex").[2] Medex was a franchisor of businesses that provide non-emergency transportation and related patient-care services. FSH paid Medex a franchise fee, an additional fee in exchange for an Area Development Agreement ("ADA"), and an operations fee in exchange for a variety of support services that were to be provided by Medex as franchisor. Barely a year later, in April 2016, FSH sent Medex a formal notice of breach of contract, to which Medex responded by terminating the franchise agreement and the ADA and asserting that FSH had committed the first material breach of the franchise agreement and misused its trademark. FSH sent its own notice of termination based on Medex's failure to cure the defaults identified in its initial notice of breach.

Following termination of the contracts, FSH initially sued Medex in state court, asserting contract- and fraud-based claims. Because their contracts required arbitration, FSH subsequently filed an arbitration demand with the American Arbitration Association, asserting claims against Medex for (1) fraud in the inducement; (2) breach of the franchise agreement; (3) breach of the ADA; (4) violation of the Tennessee Consumer Protection Act ("TCPA"); (5) slander; and (6) civil conspiracy.[3] (*See* Statement of Claim, Doc. No. 27-2.)

### B. The Policy

Defendant Westchester Fire Insurance Company ("Westchester") had issued a Miscellaneous Professional Liability Policy ("Policy") to Medex, effective May 27, 2015 to May 27, 2016 ("Policy"). (Doc. No. 1-1.) The Policy obligated Westchester to "pay on behalf of the Insured [Medex] all sums in excess of the Retention that the Insured shall become legally obligated

---

[2] Medex is also sometimes referred to as "Medex Patient Transport Services, LLC," but its correct name appears to be "Medex Patient Transport, LLC."

[3] Additional claims were asserted against Medex's owners and principals, KR Calvert Co., LLC, Kyle Calvert, and Klein Calvert, who were also named as respondents in the arbitration demand. (Doc. No. 27-2.)

to pay as Damages and Claims Expenses because of a Claim first made against" Medex while the Policy was in effect "by reason of a Wrongful Act" committed during the Policy period. (Policy ¶ I.A., Doc. No. 1-1, at 3.) The Policy imposed upon Westchester the "right and duty to defend any covered Claim brought against the Insured even if the Claim is groundless, false or fraudulent." (Policy ¶ I.B.1, Doc. No. 1-1, at 3.) It prohibited Medex, as the insured, from "admit[ting] or assum[ing] liability or settl[ing] or negotiate[ing] to settle any Claim or incur[ring] any Claims Expenses" without Westchester's prior written consent and granted Westchester the "right to appoint counsel and to make such investigation and defense of a Claim as it deems necessary." (*Id.*) The Policy defined "Wrongful Acts" as "any actual or alleged negligent act, error, omission, misstatement, misleading statement or Personal Injury Offense committed by the Insured" or its employees. (*Id.* ¶ II.T, Doc. No. 1-1, at 5.)

The Policy contained the following exclusions, among others:

The Company shall not be liable for Damages or Claims Expenses on account of any Claim:

A. alleging, based upon, arising out of, or attributable to any dishonest, fraudulent, criminal or malicious act or omission, or any intentional or knowing violation of the law by an Insured, however, this exclusion shall not apply to Claims Expenses or the Company's duty to defend any such Claim unless and until there is an adverse admission by, finding of fact, or final adjudication against any Insured as to such conduct, at which time the Insured shall reimburse the Company for all Claims Expenses incurred;

. . . .

H. alleging, based upon, arising out of or attributable to . . . unfair trade practices or other violation of the Federal Trade Commission Act . . . or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

. . . .

J. alleging, based upon, arising out of, or attributable to the gaining in fact of any profit or advantage to which the Insured it not legally entitled . . . .

(*Id.* ¶ III, Doc. No. 1-1, at 6.)

The Policy also contained a "Franchisors Endorsement" which stated, in relevant part:

> 1. Section II, Definitions, subsection T, the definition of Wrongful Act, is amended by adding the following:
>
> > Wrongful Act also means any actual or alleged plagiarism, piracy or misappropriation of ideas, neglect or breach of duty by the Insured in their capacity as such . . . in the performance or failure to perform Professional Services and which arises out of or involve one or more of the following:
> >
> > 1. any and all marketing or solicitation activities undertaken or engaged in by any of the Insureds in connection with the offer or sale of franchises pursuant to any franchise agreement, area agreement or development agreement (each such agreement is referred to herein as a "Franchise Contract");
> >
> > . . . .
> >
> > 4. the failure to comply with any federal or state law or regulation, or the terms of the Franchise Contract, affecting the renewal or termination of the relationship of the parties to a Franchise Contract;
> >
> > 5. the failure of the franchisor to provide services, training, advertising, or other support to the franchisees as required under the terms of a Franchise Contract or disclosed to franchisees in an offering circular or other distributed disclosure document . . . .

(*Id.* Franchisors Endorsement ¶ 1, Doc. No. 1-1, at 19.)

The Franchisors Endorsement also amended the Policy Exclusions by excluding coverage for claims otherwise within the scope the Franchise Endorsement:

> • alleging, based upon, arising out of or attributable to any assurance, promise, warrant or guarantee of potential sales, earnings, profitability or economic value;
>
> • alleging, based upon, arising out of or attributable to unfair competition or unfair business practices including, but not limited to, territorial infringement by either the franchisor or franchisee where such Claim arises out of or is alleged to arise out of, or be connected with, the commission of a fraudulent, dishonest, criminal intentional or malicious act, error or omission;
>
> . . . .
>
> • alleging, based upon, arising out of or attributable to the recovery by a

> franchisee of actual sums paid to the Insured by a franchisee which constitute any initial fees, service fees, royalties, lease payments, or payments for goods and services;
>
> . . . .
>
> • alleging, based upon, arising out of or attributable to the bankruptcy or insolvency of the Insured . . . .

(*Id.* ¶ 2, Doc. No. 1-1, at 20.)

### C. Westchester's Reservation of Rights

Pursuant to the Policy, Westchester provided Medex a defense while the dispute was in the Chancery Court and in arbitration, subject to an express reservation of its right to deny indemnity based on various policy exclusions. More specifically, Westchester, through Chubb North American Financial Lines Claims ("Chubb"), which administered claims on behalf of Westchester, sent at least two reservation of rights ("ROR") letters to Medex during the course of the litigation, outlining various coverage issues it believed were raised by FSH's allegations and reserving all rights under the Policy. (*See* Doc. Nos. 15-6, 15-7 (ROR letters dated June 17, 2016, and Sept. 22, 2016).) The June 17, 2016 ROR letter notified Medex that it would provide a defense to the lawsuit brought by FSH while identifying Policy provisions Westchester believed would "ultimately impact the coverage available," based on the allegations in the Complaint, including that (1) some of the Wrongful Acts identified in the Complaint took place prior to the effective date of the Policy; (2) "fees, commissions, expenses or costs paid to or charged by an Insured" were not covered damages; (3) punitive and exemplary damages would not be covered by the Policy; (4) claims under the Tennessee Consumer Protection Act were not covered; (5) claims based upon unfair trade practices or unfair business practices that allegedly arise out of or are connected with "the commission of a fraudulent, dishonest, criminal, intentional or malicious act, error or omission" fell within the exclusions identified in the Franchisors Endorsement; and (6) claims based on the

intentional or knowing violation of law are excluded from coverage. (Doc. No. 15-6, at 2–3.)

The ROR letter concluded by noting that the investigation into the matter continued and that Westchester reserved "all rights with regard to the above referenced provisions, as well as all other rights, remedies and defenses under the Policy." (*Id.* at 3.) Westchester specifically reserved the right to withdraw its defense and the right to amend the letter to address additional coverage issues, and it advised Medex that nothing in the letter "should be construed as an admission of coverage or a waiver of any available right or defense." (*Id.*)

The September 2016 ROR letter notified Medex that the insurer had engaged a law firm to defend Medex in the litigation, advised it of the liability limit and the fact that legal expenses were part of, and not in addition to, the limit of liability, and highlighted an additional coverage issue not raised in the initial ROR letter. (Doc. No. 15-7.) Westchester again reserved its right to withdraw its defense, expressly reserved all available rights, remedies and defenses under the Policy, and declined to admit coverage. (*Id.* at 2.)

### D. The Arbitration and Westchester's Denial of Coverage

Following a period of discovery, the arbitration was scheduled to begin on October 24, 2017. (Compl., Doc. No. 1, at 4.) The parties spent the first full day of the arbitration attempting to settle. According to the plaintiff, FSH offered to settle all of the claims against Medex in exchange for payment of $250,000, within the Policy limit. (Jones Decl., Doc. No. 59 ¶ 4.) Westchester, on behalf of Medex, allegedly offered only $25,000 in response. (*Id.*) FSH claims that it only became aware of the existence of an insurance policy that provided "coverage for some of the claims" against Medex during this pre-arbitration settlement attempt. (*Id.* ¶ 3.)

Westchester's account of the parties' attempts to settle is diametrically opposed to that of FSH. According to Lora Camporeale, Assistant Vice President of Chubb North American Financial Lines Claims ("Chubb") and claim supervisor for the underlying litigation involving

Medex and FSH, Westchester made several attempts to discuss settlement with counsel for FSH in the period leading up to the scheduled arbitration. (Camporeale Decl., Doc. No. 62-1 ¶¶ 1, 4.) Camporeale states that FSH consistently reiterated a demand of $1,000,000 and refused to "budge" below that sum. (*Id.* ¶ 4.) In addition, according to Camporeale, FSH's discovery responses established that it was unable to quantify the damages attributable to the breach of contract claims, the only potentially covered claims. (*Id.* ¶ 5.)

As set forth in Camporeale's Declaration, on the day the arbitration was scheduled to begin, Westchester, on behalf of Medex, made an initial monetary offer of $60,000 to settle the claims against Medex, and Medex agreed that it would dismiss its counterclaims. (*Id.* ¶ 8.) FSH responded that it would not settle for less than $650,000, and it insisted that Medex personally contribute to any settlement funds. (*Id.*) In response to FSH's demand, according to Camporeale, Westchester increased its offer to $100,000. (*Id.* ¶ 10.) FSH refused to respond to the offer, and the settlement negotiations reached an impasse. (*Id.* ¶ 11.) However, Westchester left its settlement offer of $100,000 open while the parties proceeded to arbitration. (*Id.* ¶ 11.) Camporeale attests that FSH's unwillingness to provide support for its breach of contract damages and its insistence that Medex contribute personally toward any monetary settlement were partially responsible for the impasse. (*Id.* ¶ 11.)

In any event, having failed to settle, the parties proceeded to arbitrate. Several months after the hearing, on January 8, 2018, the arbitrator issued a Final Award, ruling in favor of FSH and awarding damages against Medex on the claims for breach of the franchise agreement, breach of the ADA, intentional misrepresentation, fraudulent inducement, and violation of the TCPA. (Doc. No. 1-5, at 12–14.) The arbitrator denied relief on FSH's claims for slander and civil conspiracy. (*Id.* at 14.) The arbitrator also awarded FSH attorney's fees and costs. (*Id.* at 14–15.) As quoted in

the defendant's Statement of Undisputed Facts (and not disputed by the plaintiff), the arbitrator found the following facts and made the following conclusions, which were adopted in the Chancery Court Judgment:

- Respondents breached and wrongfully repudiated and terminated the [Franchise Agreement ("Agreement")] and ADA and defrauded Claimant by intentional and knowing conduct causing damages to Claimant.

- Respondents continued to intentionally misrepresent and conceal material facts from FSH and induce FSH to continue to perform and to pay the Operations Fees and royalties to Medex even though FSH was not receiving the services and the quality of services promised.

- The Respondents' representations, conduct and omissions were material and likely to mislead a reasonable consumer, FSH, to its detriment which did cause damage to FSH.

- The oral representations, promotional materials, brochures and statements made before and after the signing of the Agreement were not in contradiction of the language of the Agreement and [Franchise Disclosure Document ("FDD")] about the "outsourced operations support," but were about, in support of, and in explanation of "outsourced operations support," the very heart of the Agreement and from which FSH was to pay a 10% Operations Fee. Furthermore, FSH's reliance upon said representations was reasonable[,] and Respondents knowingly made the representations, intending for FSH to rely upon them[,] and Respondents knew they were false at the time they were made and did not intend to perform as represented.

- The understaffing and deficiencies of the Call Center existed and were known by the Respondents prior to FSH signing the Agreement and continued thereafter.

- Prior to signing the Agreement, the Respondents minimized or blamed any problems on the franchisees with whom FSH had spoken, or stated they had been fixed when they had not, evidencing Respondents' knowledge of the problems with its operations, failures to disclose the deficiencies in Medex's "outsourced operations support" and the continuation of those problems and deficiencies for months which is evidence of Respondents' intention not to provide the products and services they represented to FSH at the time FSH signed the Agreement and continued to do so to induce FSH to continue to perform and generate money for Medex.

- FSH's inspection and contacts with franchisees prior to signing the Agreement do not preclude FSH from its claims herein, especially considering the Respondents' minimization and explanation of the problems and

concealments . . . . Consequently, all the relevant information was not available to FSH and it did not have the opportunity to discover the fraud, misrepresentations and concealment.

- Furthermore, prior to FSH signing the Agreement, Medex was not providing "first class and high quality" services to the other franchisees . . . and did not provide . . . "first class and high-quality" service to FSH. Respondents acknowledged that the Call Center operations such as call hold times did not meet industry standards and the Pantonium Software was deficient prior to signing the Agreement and continued to be deficient into the spring of 2016 and was no longer used by Medex after FSH was terminated.

- Respondents intended to deceive FSH and knew that their statements and representations were material and false or at a minimum made by them with a reckless disregard of whether they were true or false, evidencing intentional misrepresentations.

- The promotional materials and brochures and the statements of the Respondents are evidence of their knowledge and their intent, including making statements about goods and services and the quality of those goods and services which did not exist at the time made or were made with reckless disregard and are directly and specifically referenced in the FDD and the Agreement.

  . . . .

- Medex compounded the problems FSH, and possibly others, was experiencing by denying FSH access to certain dispatchers, . . . refusing to enter trips and declining 16 trips related to Methodist Hospital that FSH was not informed about, FSH customers could not get through to the Call Center, not informing FSH of trip requests which the Call Center had denied servicing, as well as FSH being shut off the system [sic], turned back on the system [sic], Medex changing operations that have been permitted, and Medex still failing to provide 24/7 service for FSH clients who needed night services and were generating revenue for Medex.

- The representations, misrepresentations, concealments and actions of Respondents . . . were intentional, fraudulent and with reckless disregard of the truth in their efforts to induce Jones and FSH to enter into the Agreement and to continue as a franchise generating revenue for Medex and incurring costs and expenses FSH was told it would not incur and losing revenue due to Medex's failures.

- Respondents' conduct was fraudulent, knowing and intentional and was the cause of the damages awarded to Claimant.

(Pl.'s Resp. to Def.'s Statement Undisp. Facts ¶ 4, Doc. No. 64, at 4–6; *see also* Doc. No. 1-5, at

4–11.)

The arbitrator awarded damages to FSH, broken down as follows:

a.  Against Medex Patient Transport Services, LLC:

| | |
|---|---|
| Medex Breach of Agreement | $120,461.00 |
| Medex Breach of ADA | $452,065.00 |
| | $572,526.00 |

b.  Against Medex Patient Transport Services, LLC, Kyle Calvert, and Klein Calvert, jointly and severally:

| | |
|---|---|
| Medex, Klein & Kyle Misrepr[esentation] | $613,702.00 |
| Medex, Klein & Kyle Fraud[ulent Inducement] | $613,702.00 |
| Medex, Klein & Kyle TCPA | $613,702.00 |
| | $613,702.00[4] |

c.  Against Medex Patient Transport Services, LLC, Kyle Calvert, and Klein Calvert, jointly and severally:

| | |
|---|---|
| Medex, Klein & Kyle Attorney Fees, Exp, Costs | $244,717.00 |

d.  Against Medex Patient Transport Services, LLC, Kyle Calvert, and Klein Calvert, jointly and severally:

| | |
|---|---|
| Medex, Klein & Kyle Arbitration Costs | $34,200.01 |

(Doc. No. 1-5, at 15.) The total amount awarded was $1,465,145.01.

The Davidson County Chancery Court confirmed the arbitration award and entered Judgment against Medex on February 26, 2018. (Doc. No. 1-6.)

Following issuance of the arbitrator's Final Award but prior to entry of Judgment, Westchester notified Medex that it was denying coverage for any portion of the arbitration award based on several different Policy exclusions, including exclusions for fraudulent and intentional conduct and for damages that "represent[] a refund of the Franchise Fee and the Royalty Fee paid by FSH to the Insured," among others, and based on its determination that "all Wrongful Acts

---

[4] The arbitrator held that "[t]he awards for violation of the Tennessee Consumer Protection Act and for fraud and misrepresentation represent damages for the same conduct, and thus the awards are not cumulative." (Doc. No. 1-5, ¶ 47.)

forming the basis of the award took place prior" to the May 27, 2015 effective date. (Feb. 7, 2018 Denial Letter, Doc. No. 1-7, at 2–3.) In a subsequent letter, it reconfirmed the denial of coverage and reserved all rights and defenses available under the Policy. (April 27, 2018 Letter, Doc. No. 15-9.)

### E. This Lawsuit

Medex filed for Chapter 11 bankruptcy relief in May 2018. *In re Medex Patient Transport, LLC*, No. 3:18-bk-03189 (M.D. Tenn. Bankr. May 10, 2018). By Order dated November 19, 2018, the bankruptcy court assigned the Policy and all claims under the Policy to FSH. (Doc. No. 1-2.) On February 7, 2019, FSH, stepping into Medex's shoes, filed suit in this court against Westchester.[5] It invokes diversity jurisdiction and asserts claims for breach of the Policy, specifically referencing only Westchester's refusal to pay the judgment against Medex for breach of contract and attorney's fees and costs (Count One); bad faith refusal to pay that portion of the Judgment attributable to breach of contract, attorney's fees, and the arbitration costs, in violation of Tenn. Code Ann. § 56-7-105 (Count Two), and common law bad faith failure to settle within policy limits (Count Three). (Doc. No. 1.) FSH does not dispute that the portion of the Judgment attributable to the fraud, misrepresentation, and TCPA claims is not covered by the Policy.

The case was originally assigned to Judge William L. Campbell, Jr., of this court. On March 31, 2020, Judge Campbell denied Westchester's Motion for Summary Judgment, holding that the policy exclusions identified by Westchester do not apply to the award of damages for the breach of contract claims, attorney's fees, or arbitration costs and that these amounts are covered by the Policy. (*See* Memorandum and Order, Doc. Nos. 30, 31.) Because Westchester argued only that,

---

[5] In March 2019, several months after the assignment and approximately one month after this lawsuit was filed, the bankruptcy case was converted to one under Chapter 7, and John C. McLemore was appointed to serve as Chapter 7 Trustee. (*See* Doc. No. 39, at 2.)

since it "was correct in its decision that no portion of the judgment triggered a duty to indemnify the insured, there can be no bad faith" (Doc. No. 15, at 17), the court denied the motion in its entirety without specifically addressing the bad faith claims.

On June 23, 2020, Judge Campbell granted the plaintiff's Motion for Partial Summary Judgment on its breach of contract claim (Count One), finding that Westchester had wrongfully denied coverage under the Policy, basically for the same reasons set forth in the Memorandum denying Westchester's Motion for Summary Judgment. (Doc. No. 36.) The court directed briefing on the issue of damages related to that count. (*Id.* at 2.)

On July 1, 2020, Westchester filed a Motion for Leave to File Supplemental Brief in Support of Motion for Summary Judgment on Remaining Bad Faith Claims, to which it attached the proposed Supplemental Brief. (Doc. No. 38, 38-1.) That motion was ultimately denied as moot in light of the briefing of the motions currently before the court, but the proposed Supplemental Brief raised, for the first time, the defendant's argument that the bad faith claims are not assignable and, therefore, must be dismissed as a matter of law. (Doc. No. 38-1, at 7.) Apparently in response to that filing, the Trustee filed his Motion to Intervene on July 9, 2020 (Doc. No. 39), which prompted Judge Campbell's recusal and the reassignment of this case to the undersigned (Doc. No. 40.) Westchester filed a Response in opposition to the Motion to Intervene (Doc. No. 45), and the Trustee, at the court's direction, filed a Reply (Doc. No. 53.) FSH filed a Response indicating that the issues raised by the Motion to Intervene should be fully briefed and that intervention would not prejudice the defendant, as it would "change [nothing] except the formal identity of the Plaintiff" with respect to Counts Two and Three, the bad faith claims. (Doc. No. 47, at 3.) FSH also contends, however, that bad faith claims are assignable as a matter of law.

The undersigned conducted a case management conference on July 27, 2020 and

subsequently entered an Order specifically authorizing the parties to file cross-motions for summary judgment on the bad faith claims. (Doc. No. 51.) On August 31, 2020, each party filed its own Motion for Partial Summary Judgment (Doc. Nos. 54, 55), supporting Memorandum of Law (Doc. Nos. 54-1, 56), Statement of Undisputed Facts (Doc. Nos. 54-2, 57), and various exhibits. Each party has now responded to the other's Motion and Statement of Undisputed Facts (Doc. Nos. 62, 62-2, 63, 64), and each filed a Reply (Doc. Nos. 67, 68).[6]

## II.    MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(B). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844,

---

[6] Meanwhile, the parties have also briefed the issue of damages related to breach of contract, as ordered by Judge Campbell after he granted summary judgment to the plaintiff on the issue of liability on that claim (Count One of the Complaint). (Doc. Nos. 42, 52.) The court will address that issue in a separate order.

852 (6th Cir. 2018).

"[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). In this situation, the court must "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). The fact that both parties file motions for summary judgment does not mean that judgment as a matter of law is necessarily warranted in favor of one of them, even if many of the facts are stipulated or agreed upon. *See B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) ("A trial court may conclude, when reviewing the undisputed material facts agreed upon by the parties and drawing all inferences, in turn, for the non-moving party, that a genuine issue exists as to those material facts, in which case the court is not permitted to resolve the matter, but rather, must allow the case to proceed to trial.").

**B.    Count Two**

In Count Two of the Complaint, the plaintiff asserts a claim of bad faith refusal to pay a claim, in violation of Tenn. Code Ann. § 56-7-105(a). (Doc. No. 1 ¶¶ 37–39.) The plaintiff now concedes that the Tennessee courts have unambiguously held that § 56-7-105(a) "applies only 'to that class of written contracts, which written contracts themselves, [bear] interest from the time they [become] due.'" *St. Paul Fire & Marine Ins. Co. v. Smith*, 767 F.2d 921 (Table), 1985 WL 13383, at *5 (6th Cir. June 26, 1985) (quoting *Tenn. Farmers Mut. Ins. Co. v. Cherry*, 374 S.W.2d 371, 372 (Tenn. 1964)). That is, as explained in *Cherry*, it applies to "life insurance, fire insurance and accident insurance" policies, "since these types of insurance policies would bear interest from the time they became due, regardless of whether a judgment was recovered on them or not." *Cherry*, 374 S.W.2d at 372. It does not apply to liability insurance policies pursuant to which an insurance company "agrees to pay, on behalf of the insured and within specified limits, all sums

which the insured shall become legally obligated to pay as such damages" to a third party. *Id.*; *see also Draper v. Great Am. Ins. Co.*, 458 S.W.2d 428, 433 (Tenn. 1970); *Hurst Co. v. Bituminous Ins. Cos.*, No. 03A01-9707-CH-00304, 1998 WL 283069, at *1 (Tenn. Ct. App. May 28, 1998). The plaintiff acknowledges that these cases, the most recent of which is more than twenty years old, have never been overruled[7]. (Doc. No. 63, at 2.)

Based on the plaintiff's concession, the defendant is entitled to summary judgment in its favor on this claim.

### C. Count Three

In Count Three, the plaintiff asserts a claim for bad faith failure to settle within policy limits.

Under Tennessee law, "[i] t is well established that an insurer having exclusive control over the investigation and settlement of a claim may be held liable to its insured for an amount in excess of its policy limits if as a result of bad faith it fails to effect a settlement within the policy limits."

---

[7] While the referenced cases have not expressly been overruled, in 2003 the Tennessee Supreme Court reversed a trial court's issuance of a directed verdict in favor of an insurance company that provided liability insurance, in a case involving coverage for injuries sustained in an automobile accident. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815 (Tenn. 2003). The plaintiff in that case brought a claim for bad faith denial of coverage, expressly invoking Tenn. Code Ann. § 56-7-105. Without referencing any of the above-cited cases, the Tennessee Supreme Court stated: "The language of this statute expressly applies to insurance companies and provides that a jury decide whether the evidence demonstrates bad faith on the part of the insurer. We believe that a reasonable jury could conclude that [the insurer's] conduct in this case constituted bad faith in connection with its refusal to pay [the plaintiff's] claim." *Gaston*, 120 S.W.3d at 822. The court did not state that it was overruling *Cherry*, and it is unclear from the record whether the insurance company brought *Cherry* or the line of cases on which it relied to the court's attention. The Tennessee Supreme Court typically exercises its power to overrule former decisions "sparingly . . . and only when the reason is compelling." *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 262 (Tenn. 2015). It generally does so only with great deliberation. *See, e.g.*, *id.* This court, accordingly, cannot conclude that *Gaston* overruled *Cherry* simply by implication, though the more recent opinion certainly calls into question the continuing validity of *Cherry*.

*Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006) (citation omitted). As

the Tennessee Supreme Court explained:

> Bad faith refusal to settle is defined, in part, as an insurer's disregard or demonstrable indifference toward the interests of its insured. This indifference may be proved circumstantially. Bad faith on the part of the insurer can be proved by facts that tend to show a willingness on the part of the insurer to gamble with the insured's money in an attempt to save its own money or any intentional disregard of the financial interests of the plaintiff in the hope of escaping full liability imposed upon it by its policy. If the claim exceeds the policy limits, then the insurer's conduct is subject to close scrutiny because there is a potential conflict of interest between the insurer and the insured.

> To discharge its duty to act in good faith, an insurer must exercise ordinary care and diligence in investigating the claim and the extent of damage for which the insured may be held liable. The manner in which the insurer investigates the case has an important bearing upon the question of bad faith in refusing or failing to settle the claim. Ordinary care and diligence in investigation require the insurer to investigate the claim to such an extent that it can exercise an honest judgment regarding whether the claim should be settled. Courts must review the facts that were known to the insurer and its agents and that should have been considered in deciding whether to settle.

> Mere negligence is not sufficient to impose liability for failure to settle. Moreover, an insurer's mistaken judgment is not bad faith if it was made honestly and followed an investigation performed with ordinary care and diligence. However, negligence may be considered along with other circumstantial evidence to suggest an indifference toward an insured's interest. The question of an insurance company's bad faith is for the jury if from all of the evidence it appears that there is a reasonable basis for disagreement among reasonable minds as to the bad faith of the insurance company in the handling of the claim.

*Id.* at 370–71.

Specifically with respect to the plaintiff's Motion for Summary Judgment on this issue, the

court finds that a material factual dispute precludes judgment as a matter of law in favor of the

plaintiff. As set forth above, the plaintiff has presented evidence that it offered to settle the

underlying litigation for $250,000, within policy limits, and that Westchester refused to offer more

than $25,000 and failed to engage seriously in settlement negotiations. (*See* Jones Decl., Doc. No.

59.) Westchester, on the other hand, has presented evidence indicating that it made repeated efforts

to settle, even prior to the arbitration, that the discovery leading up to arbitration revealed that FSH could not quantify the damages specifically related to breach of contract, and that FSH refused to back away from its demand of $650,000, insisted that Medex and its principals personally pay some portion of the settlement, and failed to respond to Westchester's last offer of $100,000. (*See* Camporeale Decl., Doc. No. 62-1.) If a jury believes the version of events presented by Westchester, the jury could reasonably find that Westchester did not act in bad faith during the settlement negotiations and that the failure to reach a settlement resulted from the plaintiff's intransigence rather than from bad faith on the part of Westchester. The plaintiff's Motion for Summary Judgment on this issue will, therefore, be denied.[8]

As for the defendant's motion, the defendant argues that, even assuming the plaintiff's version of events is correct, it is entitled to judgment in its favor as a matter of law, because (1) "Westchester at all times defended under a reservation of rights to deny any duty to indemnify" (Doc. No. 54-1, at 17), and (2) the bad faith claims are not assignable.[9]

Regarding the first argument, Westchester contends more specifically that a bad faith failure to settle claim may be pursued only "where the insurer unconditionally controls the defense

---

[8] The court does not mean to imply that these are the only material factual disputes that will have to be resolved at a trial of this claim.

[9] The defendant also asserts that "Tennessee does not recognize a general common law tort for bad faith by an insurer against an insured; rather, the exclusive remedy for such conduct is statutory, provided by Tennessee Code Annotated § 56-7-105." (Doc. No. 54-1, at 17.) This is not strictly true. The defendant, however, does not appear to be implying that the exclusive remedy for bad faith is statutory. Rather, as it recognizes, "[t]he law in Tennessee now provides that the statutory remedy for bad faith is the exclusive *statutory* remedy for an insurer's bad faith refusal to pay on a policy." *Lindenberg v. Jackson Nat'l Life Ins. Co.*, 912 F.3d 348, 359 (6th Cir. 2018) (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 925 (Tenn. 1998); *Riad v. Erie Ins. Exch.*, 436 S.W.3d 256, 275 (Tenn. Ct. App. 2013)). As a result, "a plaintiff may freely pursue common law claims and remedies alongside [or in the alternative to] a statutory bad faith claim." *Id.* (citing *Riad*, 436 S.W.3d at 276; Tenn. Code Ann. § 56-8-113). In any event, the defendant does not dispute that "Tennessee law does permit a tort claim by an insured against its insurer for bad faith failure to settle" (Doc. No. 67, at 2), which is the claim at issue here.

and settlement of claims against the insured." (*Id.* at 2.) It points out that, in the cases cited by the plaintiff, upholding jury verdicts in favor of plaintiffs on such claims, specifically *Johnson*, *supra*, and *The Heil Co. v. Evanston Insurance Co.*, No. 1:08-CV-244, 2014 WL 11395157 (E.D. Tenn. Mar. 21, 2014), the defendant insurance companies had exclusive control over the settlement process and did not dispute the question of coverage.

On the other hand, in *Leverette v. Tennessee Farmers Mutual Insurance Co.*, No. M2011-00264-COA-R3CV, 2013 WL 817230 (Tenn. Ct. App. Mar. 4, 2013), the insurance company initially declined to defend and declined coverage of the claims in a lawsuit against the insured's minor child, based on a policy exclusion. As a result of the insurance company's failure to defend, the injured party obtained a $1 million default judgment against the minor. The minor's parents and the injured party then jointly filed suit against the insurance company for breach of contract and bad faith, among other claims. *Id.* at *1. The trial court granted summary judgment to the plaintiffs on the issue of coverage, holding that the exclusion relied on by the insurer did not apply, and the other claims went to trial. The jury awarded the plaintiffs compensatory and punitive damages on the "bad faith claim." *Id.*

On appeal, the court vacated the holding of liability for bad faith, "since the statutory cause of action was not plead[ed]." *Id.* That is, although the plaintiffs specifically alleged that the defendant's "acts or omissions . . . constitute the tort of bad faith," they invoked the Insurance Trade Practices Act, Tenn. Code Ann. §§ 56-8-101 *et seq.*, which does not authorize private causes of action. *Leverette*, 2013 WL 817230, at *16. The court observed that a different statute, Tenn. Code Ann. § 56-7-105, "applies to insurers" and "provides for a 25% penalty where refusal to pay the claim is not made in good faith." *Leverette*, 2013 WL 817230, at *17 (citing *Gaston*, 120 S.W.3d at 822). However, upon "careful review of the Complaint," the court concluded that the

plaintiffs "did not allege liability under Tenn. Code Ann. § 56-7-105," nor did they assert on appeal that they made a claim under the statute. *Id.* "Instead, by submitting the question of punitive damages to the jury and approving the award of punitive damages for bad faith, rather than the 25% statutory penalty, it is clear that any 'bad faith' liability was based on Plaintiff's claim for 'the tort of bad faith,' as stated in the Complaint." *Id.*[10]

With regard to the common law tort of bad faith, the court stated: "[T]his court has held that Tennessee does not recognize the tort of bad faith in suits between an insured and her insurer where the actions complained of are covered by the bad faith penalty statute." *Id.* at *17 (citing *Chandler v. Prudential Ins. Co.*, 715 S.W.2d 615 (Tenn. Ct. App. 1986)). Then, in response to the plaintiffs' assertion that *Chandler* was no longer good law in light of *Johnson*, the court concluded that *Johnson* addressed only a common law claim of bad faith failure to settle, as opposed to bad faith failure to pay a claim:

> To the contrary, *Johnson* and the cases cited therein address the duty of an insurance company to settle within policy limits. In that situation, the insurer has not refused to pay a claim, so the bad faith statute is not applicable. Instead, the insurer has *already acknowledged coverage and liability* and has undertaken to provide a defense for the insured in suits or actions by third parties.

*Leverette*, 2013 WL 817230, at *18 (emphasis added). Based on this language, Westchester argues that it cannot be held liable for bad faith failure to settle, because it never acknowledged liability and, indeed, in the aftermath of the issuance of the arbitrator's Final Award and the Chancery Court Judgment, denied liability altogether.

But those events occurred *after* the failed settlement. Regarding *pretrial* efforts to settle, the court in *Leverette* continued: "It has long been the law in this state that an insurance company

---

[10] Notably, the court did not cite *Cherry* or hold that relief under the bad faith statute was unavailable on the basis that the case involved liability insurance for third-party claims, only that the plaintiffs had not pleaded such a claim.

has a special duty to its insureds after it undertakes defense of a claim against those insureds. *Johnson* and its predecessors recognize that duty." *Id.* at *19. Westchester does not dispute that it undertook a defense in this case, but it emphasizes that it did so with a reservation of rights, and it appears to contend that it did not have "exclusive control over the investigation and settlement of a claim." *Id.* (quoting *Johnson*, 205 S.W.3d at 370). (*See* Doc. No. 67, at 2 (quoting *Johnson* and stating: "Westchester did not unconditionally defend Medex and refuse to settle the case while acknowledging coverage. Instead, Westchester at all times disputed any indemnity obligation under the policy.").) In *Leverette*, however, the insurance company denied any obligation to defend as well as liability. It therefore never incurred any "special duty" with regard to settlement.

In this case, by undertaking a defense, Westchester also assumed a duty to explore, in good faith, the possibility of settlement within claim limits and in its client's best interest. Medex apparently did not have separate counsel at the arbitration, so it was entirely dependent upon counsel retained by Westchester to represent it during settlement negotiations and at the arbitration hearing. Moreover, the ROR letters Westchester sent to Medex made it clear that Medex was required to obtain its "prior consent before offering or agreeing to pay an amount which is in excess of the per Claim Retention in order to settle any Claim." (Doc. No. 15-6, at 2.) In other words, irrespective of Westchester's reservation of rights, it appears to have had exclusive control over the investigation and settlement of FSH's claim against Medex.[11] To reiterate the Tennessee

---

[11] To the extent that there is a material factual dispute as to whether Westchester exercised such control, the court must draw all relevant inferences in favor of the plaintiff in ruling on Westchester's motion. Lora Camporeale states in her Declaration that "Medex, acting through its personal counsel, made its own attempt to resolve the dispute with FSH without any involvement from Westchester" (Doc. No. 62-1 ¶ 13), but she does not indicate when this attempt occurred, whether Westchester had already assumed the defense, or whether the attempted settlement would have been in excess of the per Claim Retention referenced in the June 17, 2016 ROR letter. Thus, Camporeale's Declaration does not refute the plaintiff's allegation that Westchester had exclusive control over the settlement process by the time the parties reached the arbitration.

Supreme Court's pronouncement in *Johnson*: "It is well established that an insurer having exclusive control over the investigation and settlement of a claim may be held liable to its insured for an amount in excess of its policy limits if as a result of bad faith it fails to effect a settlement within the policy limits." 205 S.W.3d at 370.

The court concludes, as a result, that the defendant is not entitled to summary judgment on the bad faith failure to settle claim as a matter of law, purely on the basis that it provided a defense subject to a reservation of rights. By providing a defense, it incurred a duty to negotiate settlement in good faith as an integral part of that defense, and it may be held liable if it failed to do so. The defendant is not entitled to summary judgment in its favor on this issue.

Having concluded that this claim is not subject to dismissal as a matter of law, the court turns to the question of whether the claim was assignable to begin with and whether the Trustee should be permitted to intervene in this case.

## III.     MOTION TO INTERVENE

On July 9, 2020, John C. McLemore, as Chapter 7 Trustee, filed his motion seeking authority to intervene in this case under Rule 24(a) of the Federal Rules of Civil Procedure. (Doc. No. 39.) In support of the motion, the Trustee states that he agrees with the defendant's "assessment that, under Tennessee law, all claims for bad faith belong to the Trustee and the bankruptcy estate." (Doc. No. 39, at 2.) The Trustee further posits that, if the court finds, as the defendant argues, that Medex's transfer of its bad faith causes of action to FSH was invalid, then no transfer was actually effected and those causes of action belong to the Trustee and the bankruptcy estate. As a result, the Trustee contends, the court should permit the Trustee to intervene in this case and be substituted as the plaintiff for the bad faith causes of action instead of dismissing the claims, as the defendant demands.

In response, the defendant argues that the Trustee seeks to intervene to pursue claims that

"Medex has already assigned away and that are no longer assets of the Debtor's estate." (Doc. No. 45, at 1.) Westchester also argues that the Trustee's motion is "procedurally deficient," insofar as he failed to file a memorandum of law in support of his motion, and "substantively deficient," insofar as he has failed to demonstrate that he has met any of the necessary criteria for intervention as of right under Rule 24. (Doc. No. 45, at 1–2.)

In FSH's response to the Trustee's motion, FSH first posits that, if Westchester is correct that bad faith claims are not assignable, then the Trustee should be substituted for the plaintiff on those claims and that such substitution would have no substantive effect on the case and would not prejudice the defendant in any way. FSH also argues as a matter of law that the bad faith claims are assignable and, therefore, that intervention is not necessary. (Doc. No. 48 (cross-referenced in Doc. No. 47).)

In his Reply, the Trustee adopts the defendant's arguments as to why the bad faith claims are not assignable but refutes the defendant's arguments regarding the propriety of intervention. (Doc. No. 53.)

### A.    Bad Faith Claims Are Not Assignable

Only one bad faith claim has been determined to be viable—the claim in Count Three for bad faith failure to settle. The Tennessee Supreme Court has held unequivocally that such claims are not assignable. *Dillingham v. Tri-State Ins. Co.*, 381 S.W.2d 914 (Tenn. 1964); *Carne v. Md. Cas. Co.*, 346 S.W.2d 259 (Tenn. 1961). While the holding in *Carne* arguably was based on survivability statutes that have since been modified and on principles that have little relevance in the context of a purely commercial dispute, the decision in *Dillingham* was based at least in part on considerations of public policy. The court there first concluded, as a matter of contract law and public policy, that a judgment creditor has no ability to recover directly against the insured defendant's insurance company for claims for "the excess of the judgment over the policy

limits"—that is, claims for bad faith failure to settle. *Dillingham*, 381 S.W.2d at 918. In reaching

that conclusion, the court quoted at length from a law review article addressing that question,

which emphasized that the claimant, *per se*, is not actually harmed by an insurance company's

failure to settle within the limits of its insured's policy:

> [I]f there is a sizeable disparity between the settlement offer and the amount of the judgment obtained in the trial which follows refusal of the offer, claimant is benefited rather than harmed by company's refusal to settle. It would therefore be anomalous to permit claimant to recover directly against company in his own right (in the absence of policy provision . . . clearly having that meaning.)

*Dillingham*, 381 S.W.2d at 916–17 (quoting Robert E. Keeton, *Liability Insurance &*

*Responsibility for Settlement*, 67 Harv. L. Rev. 1136, 1175 (1954)).

Likewise, addressing the second issue on appeal in that case, whether the insured/judgment

debtor can assign a bad faith failure to settle claim to a claimant/judgment creditor, the court relied

heavily on the same law review article in answering that question in the negative as well:

> A doctrine . . . permitting claimant to recover the excess from company, either in his own right or as assignee of insured, is only slightly beneficial to insured—that one who is the victim of company's wrong. Insured is protected by the cause of action for reimbursement. This additional remedy [i.e., the bad faith claim] would benefit insured only by making possible at claimant's option a transfer from insured to claimant of the cost of enforcing the claim of excess liability—such expenses and attorney's fees as are not included in the measure of recovery. The person greatly benefited by such doctrine is claimant—a person not harmed by company's refusal to settle. A judicial extension (either by tort or by implied contract theory) of the liability of company beyond that undertaken by the agreement cannot be justified by a purpose of benefiting a third party who is not harmed by anything company has done or failed to do.'

Id. at 918 (quoting Keeton, *supra*, at 1176–77). The court then concluded, succinctly, that *Carne*

"clearly states the Tennessee rule" that bad faith claims are not assignable. That holding has been

repeatedly applied by the courts of Tennessee and federal district courts applying Tennessee law.

*See, e.g.*, *Elec. Ins. Co. v. Nationwide Mut. Ins. Co.*, 384 F. Supp. 2d 1190, 1193(W.D. 2005) ("A

cause of action against an insurer for alleged bad faith or negligence in refusing to settle an

insurance claim within the policy limit, however, is not assignable under Tennessee law." (citing *Dillingham*, 381 S.W.2d at 917–19); *Great Am. Ins. Co. of New York v. Fed. Ins. Co.*, No. M2009-00833-COA-R3-CV, 2010 WL 1712947, at *4 (Tenn. Ct. App. Apr. 28, 2010) (citing *Elec. Ins. Co.* approvingly).

The plaintiff now offers some compelling reasons as to why that rule should be set aside, but it has not pointed to any Tennessee case overruling either *Carne* or *Dillingham*. Moreover, the case it relies on, *Can Do, Inc. Pension & Profit Sharing Plan v. Manier, Herod, Hollabaugh & Smith*, 922 S.W.2d 865, 869 (Tenn. 1996), held as a matter of public policy only that legal malpractice claims are not assignable. As another judge of this court stated when faced with a similar argument, "*Dillingham* has not been overruled, and it continues to be cited as authority for the holding that bad faith claims are not assignable." *Wesley v. Liberty Ins. Corp.*, No. 3-14-2363, 2015 WL 5999879, at *2 (M.D. Tenn. Oct. 14, 2015) (Campbell, Todd, Ret. J.). This court is compelled to agree. While the holding in *Can Do* may have called into question some of the reasoning that led to the decision in *Carne*, it did not expressly overrule any part of either that case or *Dillingham*. And, as previously indicated, *see* Note 7, *supra*, the Tennessee Supreme Court typically exercises its power to overrule earlier decisions sparingly and with great deliberation, as a result of which this court would be extremely hesitant to find an earlier case overruled by implication in a later case, absent compelling circumstances that are not presented here.

In sum, the court concludes that, under Tennessee law, a cause of action for bad faith failure to settle is not assignable. Because it was not assignable, the assignment was not effective, and the claim remains an asset of the bankruptcy estate. *See In re Cottrell*, 876 F.2d 540, 542 (6th Cir. 1989) (holding that an existing personal injury claim that is non-assignable under state law is the property of a bankruptcy estate). Moreover, as discussed below, the bankruptcy Trustee is the real

party in interest with respect to this claim.

B.    The Standards for Intervention

The court rejects Westchester's argument that the Motion to Intervene is improper or must be dismissed simply on the basis that it was not filed with a separate memorandum of law. The Trustee agreed with the defendant's assertion that bad faith claims are not assignable, and he clearly sought intervention under Rule 24 based on the standards applicable to intervention. He apparently did not perceive his request as requiring the resolution of an issue of law. Regardless, the substantive question issues have largely now been briefed.

The Trustee seeks intervention as of right under Rule 24(a)(2), which provides that the court

> must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

The Sixth Circuit has interpreted Rule 24(a) as "establishing four elements" that must be satisfied before a court will grant intervention as of right:

> (1) timeliness of the application to intervene, (2) the applicant's substantial legal interest in the case, (3) impairment of the applicant's ability to protect that interest in the absence of intervention, and (4) inadequate representation of that interest by parties already before the court.

*Stupak-Thrall v. Glickman*, 226 F.3d 467, 471 (6th Cir. 2000) (citation omitted). Failure to meet any of these criteria will result in the denial of the motion, but the Sixth Circuit has also cautioned that Rule 24 should be "broadly construed in favor of potential intervenors." *Id.* at 472 (quoting *Purnell v. Akron*, 925 F.2d 941, 950 (6th Cir. 1991)). Westchester argues that the motion is untimely and that the applicant has no substantial legal interest to protect. It does not raise any substantive arguments based on the other two elements, positing only that, because the Trustee has no legal interest in the case, he cannot establish an impairment of his ability to protect that interest

or that the parties before the court cannot adequately protect the interest. The Trustee argues that each of the necessary elements is met, and FSH effectively concedes that intervention as of right should be permitted if the bad faith claim is not assignable.

        *1.    Timeliness*

Regarding timeliness, Westchester argues that the Trustee did not seek to intervene until more than a year after this case was filed, after the passage of discovery and expert disclosure deadlines, after rulings on dispositive motions, and mere weeks prior to the originally scheduled trial date. It argues that, "[b]y any measure," the delay in filing the motion in this case is "glaring." (Doc. No. 45, at 3.) The defendant does not, however, argue that it would be prejudiced by intervention. The Trustee points out that Westchester never objected to the assignment until July 1, 2020, in a proposed supplemental brief filed after the court denied Westchester's first Motion for Summary Judgment; the Trustee sought intervention within days of being apprised of Westchester's position regarding assignment set forth in its proposed brief; and, because the Trustee simply seeks to be substituted as the plaintiff with respect to the bad faith claim and does not seek to file new pleadings, raise new issues, take discovery, or engage in "any other action to derail the timely judicial resolution of this matter," the defendant has not been prejudiced by any delay. (Doc. No. 53, at 5.)

   The Sixth Circuit has identified a number of factors to be considered in evaluating timeliness, including

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Stupak-Thrall*, 226 F.3d at 473 (6th Cir. 2000) (*Jansen v. City of Cincinnati*, 904 F.2d 336, 340

(6th Cir. 1990)). In addition, however, "[t]he propriety of intervention in any given case . . . must be measured under 'all the circumstances' of that particular case," and "[t]he absolute measure of time between the filing of the complaint and the motion to intervene is one of the least important of these circumstances." *Id.* (quoting (quoting *NAACP v. New York*, 413 U.S. 345, 366 (1973)).

It is clear that one of these factors weighs against finding the intervention to be timely: the case had progressed to the brink of trial by the time the Motion to Intervene was filed. The other factors, however, are either neutral or weigh in favor of permitting transfer. Although the defendant argues that the Trustee knew or should have known, based on the clear state of Tennessee law, that the bad faith claims asserted in the Complaint were not assignable basically as soon as he was apprised of the existence of this case and the claims asserted herein, the record indicates that the Bankruptcy Court approved the assignment in November 2018, before the Trustee had even been appointed, and Westchester did not object to the assignment. (*See* Order Approving Motion to Assign Pre-Petition Insurance Claims Against Westchester Fire Insurance Company, Doc. No. 1-1.) As a result, the Trustee had no reason to look closely at this case until Westchester did raise such an objection. The defendant did not object to the assignment until after its initial Motion for Summary Judgment had been denied, on July 1, 2020 (Doc. No. 28), and the Trustee filed his Motion to Intervene within a week of that date.

Further, the purpose of the intervention is to permit the Trustee to pursue a claim that, as discussed above, is not properly assignable and thus belongs to the bankruptcy estate. Although the case has certainly proceeded far, the defendant has not identified any prejudice it (or any other party) would suffer as a result of the delayed intervention, particularly because the Trustee simply seeks to be substituted as the plaintiff for the bad faith cause of action; he does not seek to undo or redo any action already taken in this case or roll back any of the expired deadlines. Under the

particular circumstances of this case, the court finds that the Motion to Intervene is not untimely.

### 2. The Trustee's Legal Interest

As the Trustee states in his Motion to Intervene, the "Debtor's transfer of its bad faith causes of action. . . was invalid," as a result of which "those causes of action belong to the Trustee, as fiduciary for the Debtor's bankruptcy estate." (Doc. No. 39, at 2.) Westchester raises three arguments for why the Trustee has no substantial legal interest in this case. First, it argues that the remaining bad faith claim is "substantively futile," because the bad faith failure to settle claim is subject to dismissal as a matter of law. The court has already disposed of that argument; the claim is not futile as a matter of law, and its disposition will require a trial to resolve material factual disputes.

Second, Westchester argues that the Trustee's attempt to intervene is futile, because the one-year statute of limitations for bringing a bad faith claim has expired "for new parties." (Doc. No. 45, at 9.) It does not present any legal authority for this argument, and the Trustee did not respond to it. Nonetheless, as discussed below, the court finds that the Trustee should be substituted as the real party in interest under Rule 17(a)(3) or Rule 25(c). As a result, the statute of limitations will not bar his pursuit of the bad faith claim. *See Crocheron v. State Farm Fire & Cas. Co.*, 621 B.R. 659, 664 (E.D. Mich. 2020) ("Under Rule 17, once a party has been substituted, 'the action proceeds as if it had been originally commenced by the real party in interest.' 'Thus, a correction in parties is permitted even after the statute of limitations governing the action has run.'" (quoting Fed. R. Civ. P. 17(a)(3) and 6A Charles A. Wright & Arthur R. Miller, Fed. Prac. and Proc., § 1555 (3d ed. 2020)); *Blachy v. Butcher*, 221 F.3d 896, 911 (6th Cir. 2000) (stating, following the Rule 25(c) substitution of a defendant, "Because the plaintiffs' claim against Rosemary is a continuation of their claim against Alexander, that claim is not barred by the applicable statute of limitations.").

And finally, Westchester argues that the Trustee has no legal interest at stake because the bad faith claim was assigned to FSH, as a result of which it is no longer part of the bankruptcy estate, and the Trustee has taken no action to "take back" the claims. (Doc. No. 45, at 6.) In other words, in the context of refuting FSH's Motion for Summary Judgment, Westchester argues that bad faith claims are not assignable and, therefore, that FSH cannot enforce them in this action, but, in responding to the Motion to Intervene, it argues that the bad faith claims no longer belong to the bankruptcy estate because they were assigned to FSH, however invalidly. (*See* Doc. No. 54-1, at 8 ("The non-assignability of bad faith claims in Tennessee is so clear cut that the Court's inquiry should end there.").)

That is, in Westchester's view, the remaining bad faith claim has simply fallen through the cracks: the plaintiff cannot enforce it, and the Trustee has no cognizable interest to enforce. In the Trustee's view, however, if the assignment was invalid, it was void *ab initio*, and the cause of action remains the Trustee's, as fiduciary for the Debtor's bankruptcy estate. (Doc. No. 39, at 2; *see also* Doc. No. 53, at 3 ("Either the claims were assigned or they were not; there is no third option.").) The Trustee contends that, because Westchester's position is that the claims are not assignable, it should be estopped from arguing that the Trustee does not have a cognizable legal interest in this matter.

As indicated above, the court agrees that the bad faith claim has not fallen into limbo. Because the assignment was never valid in the first place, it remains an asset of the bankruptcy estate, as a result of which the Trustee, on behalf of the estate, has a substantial legal interest in pursuing the claim.

### 3. Impairment of the Applicant's Ability to Protect His Interest

The third factor requires the court to consider the Trustee's ability to protect his interest in the relevant claim in the absence of intervention. Westchester does not raise any new basis for

opposing intervention based on this element and, instead, simply reiterates its arguments that the claim is no longer part of the bankruptcy estate and that, even if it were, the claim is substantively futile.

As set forth above, the claim is not futile and belongs to the bankruptcy estate. Consequently, the Trustee is the only real party in interest with respect to the bad faith claim, and a refusal to permit intervention would gravely impair his ability to protect that interest. This element is satisfied.

#### 4.     *Adequacy of Representation by the Parties Already Before the Court*

The Trustee is the real party in interest with respect to the bad faith claim that remains at issue. Denial of the Trustee's motion for intervention/substitution in this matter would lead to a dismissal of the claim and would deprive the bankruptcy estate of the opportunity to pursue it. This element, too, is met.

In sum, the Trustee has established that intervention should be permitted.

### C.     **The Appropriate Procedure**

More to the point, although neither of the parties addresses it as such, the question presented by the Motion to Intervene and the determination that the bad faith claim could not be assigned under state law is this: who is the real party in interest with respect to this claim? Because it was never validly transferred, the claim belongs to the bankruptcy estate, and the Trustee, as the representative of Medex's bankruptcy estate, is the only real party in interest for purposes of litigating Medex's bad faith claim against Westchester. *Accord Auday v. Wet Seal Retail, Inc.*, 698 F.3d 902, 905 (6th Cir. 2012) (holding that the district court had erred in dismissing a case without first considering the matter of the plaintiff's ability to pursue a claim that was the property of the Chapter 7 bankruptcy estate). Accordingly, the court rejects that defendant's suggestion that the Trustee is required to undertake some type of affirmative or adversary action in the bankruptcy

court to "take back" the invalidly assigned claim. The Trustee is, and has always been, the real party in interest with respect to this claim.

Courts faced with an issue like this one have employed both Rule 17 and Rule 25, or both together, to permit substitution of a bankruptcy trustee as the real party in interest. In *Knight v. New Farmers National Bank*, 946 F.2d 895 (Table), 1991 WL 207056 (6th Cir. 1991), the plaintiffs pursued fraud claims against a bank and obtained a jury verdict in their favor. The trial court granted the bank's post-trial motion for a new trial and then granted summary judgment in favor of the bank and dismissed the claim. The district court, citing *In re Cottrell*, held that the claim against the bank was one that belonged to the plaintiffs' bankruptcy estate in a bankruptcy case that had been closed for almost two years before the plaintiffs filed suit against the bank. On appeal, the Sixth Circuit agreed that the plaintiffs were "on notice of a potential cause of action for fraud" on the part of the bank by the time they filed for bankruptcy in 1983. *Id.* at *1. Further, because the cause of action was part of the bankruptcy estate, the plaintiffs lacked standing to bring the claims.[12] *Id.* at *2 (citing *Cottrell*, 876 F.2d at 543). Nonetheless, the court held that the district court erred in dismissing the claims without allowing the plaintiffs "the opportunity to seek ratification by, or substitution of, the bankruptcy trustee" under Rule 17. *Id.*

As worded at that time,[13] Rule 17 provided in pertinent part that "[n]o action shall be

---

[12] The Sixth Circuit has since clarified that the issue is not one of Article III standing. *See Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 314 (6th Cir. 2013) (noting that the plaintiff clearly satisfied the constitutional requirements for standing and that the "standing problem here— whether a debtor or only a bankruptcy trustee has the right to prosecute legal claims related to the bankruptcy estate—is better characterized as a real-party-in-interest question governed by Rule 17.").

[13] The relevant language has since been modified stylistically but not substantively. It states: "The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3) (2007).

dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest. . . ." 1991 WL 207056, at *2 (quoting Fed. R. Civ. P. 17(a) (1988)). Because the court did not "afford plaintiffs any time to substitute the trustee after determining that the trustee was the real party in interest," it vacated summary judgment and remanded with "instructions to allow ratification or substitution by the trustee." *Id.*

Somewhat similarly, in *Bauer v. Commerce Union Bank*, 859 F.2d 438 (6th Cir. 1988), the Sixth Circuit affirmed a district court's decision to substitute the bankruptcy trustee as the sole plaintiff in the case before it, but under Rule 25(c) rather than Rule 17. At that time, Rule 25(c) stated: "In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c) (1987).[14] In *Bauer*, the plaintiffs had filed for Chapter 7 bankruptcy without disclosing a potential legal claim against the defendants. *Bauer*, 859 F.2d at 439. After the bankruptcy was discharged, the plaintiffs brought an "outrageous conduct" action against the defendants in federal district court. *Id.* The defendants sought dismissal on the grounds that the plaintiffs' claim belonged to the bankruptcy estate and the plaintiffs lacked standing to sue. *Id.* The plaintiffs then sought to reopen the bankruptcy case, and the trustee was reappointed. With respect to the case still pending in the district court, the Sixth Circuit observed that "[t]he trial court ordered [the trustee] substituted as party plaintiff pursuant to Fed. R. Civ. P. 25(c), which permits the court to order substitution '[i]n case of any transfer of

---

[14] The Rule was amended stylistically in 2007. It now reads: "If an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c) (2007).

interest.'" *Id.* at 441. While noting that the order of substitution was not immediately appealable, the court also stated that it was "unable to detect so much as a hint of any abuse of discretion here." *Id.* at 441–42; *see also Auday v. Wetseal Retail, Inc.*, No. 1:10-CV-260, 2013 WL 2457717 (E.D. Tenn. June 6, 2013) (following remand, holding that the Chapter 7 trustee was the only real party in interest with respect to the debtor's employment discrimination claim that accrued pre-petition, that, although substitution under Rule 17(a) was not appropriate because the trustee had not effectively ratified the debtor's action, substitution under Rule 25(c) was warranted, and that the statute of limitations imposed no impediment to substitution under Rule 25); *Clifton v. Tenn. Pro. Assistance Program*, 3:10-0330, 2010 WL 1856513, at *7–8 (M.D. Tenn. May 10, 2010) (Trauger, J.) (holding that dismissal for lack of standing was inappropriate, based on *Knight*, and that the bankruptcy trustee, as the real party in interest, could file a notice of substitution under Rule 25(c), where the debtor had attempted to pursue her legal claim after her bankruptcy cases had been discharged and dismissed but had never disclosed her claim to the bankruptcy courts).

In the present case, the Trustee does not expressly invoke either Rule 17(a) or Rule 25(c), but he does seek to be substituted as the plaintiff with respect to the bad faith claim on the basis that the claim belongs to the bankruptcy estate—that is, that he is the real party in interest with respect to that claim. The court, having found that intervention is appropriate, will grant the Motion to Intervene and, in addition, finds that the Trustee should be substituted into the action as the plaintiff with respect to Count Three of the Complaint, under either under Rule 17(a) or Rule 25(c).

## IV.     CONCLUSION

For the reasons set forth herein, the plaintiff's Motion for Partial Summary Judgment will be denied, and the defendant's Motion for Partial Summary Judgment will be granted in part and denied in part. Specifically, summary judgment in favor the defendant will be granted on Count Two of the Complaint, for bad faith in violation of Tenn. Code Ann. § 56-7-105, based on the

plaintiff's concession. The defendant's motion will be denied as to Count Three of the Complaint, which remains pending.

The Trustee's Motion to Intervene will be granted, and the Trustee will be substituted as the real party in interest with respect to Count Three of the Complaint.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge